Final case for argument this morning is 24-1787, Vinesar v. HHS. Mr. McHugh, whenever you're ready. Good morning, Your Honor. This is a case of a 7-month-old baby, a young lady, who had her 4-month vaccinations. In the morning, 13 hours later, she had a seizure which was deemed partially to be cerebral. It was not very big febrile, but it was febrile. This seizure lasted 20 minutes. It started when she was in the living room with her father. It was a cononic seizure, which means it's the ones where they stiffen and bend sort of backwards. EMS was called. They were there quickly, and they gave her a drug that knocked it down. By the time they got to the hospital and got into the emergency room, it continued. So it went for 20 minutes. We're familiar with the history, and we've read the briefs. We're familiar with the history of this case. As a threshold matter, are you pursuing the aggravation theory here, or is your theory limited to causation? It is causation, but it's also aggravation, because the problem we have here is this febrile seizure occurred, and then there was a 3-month gap, but it's typical of this disease that there's a first seizure, and it leaves no fingerprints, and then sometimes a second or third, also no fingerprints, but the seizures continue and continue, and they get more severe as we go along. We started out with causation because, of course, the problem we had was at the time this was filed, an SC1A seizure was deemed to be causal. There is absolutely no evidence that it is. All we have is evidence that in most of these cases they find it, but they don't know how that translates into causant, because there are cases that it doesn't. They don't find it. In this particular case, we have the special master, who was the one who came up with the idea that SC1A would exclude all credit cases. He basically decided our experts are not credible, and the government's expert was. I know, but just going back to what theory you're pursuing here. Well, the theory is the SC1A was there. It is a susceptibility. It is not cause. The cause was the DPAT vaccination she got, and that was pretty much conceded because the government had... So that caused her to have the seizure and also the development of the seizure disorder? Well, that's where the fight is. The special master conceded it probably caused the seizure. But then he said, but after the seizure she was fine. The tests were done and she was absolutely normal, which is true in almost every case of Diabetes Syndrome. They always test normal after the seizure. Yeah, but notwithstanding that finding by the special master, is it your position that the vaccine triggered the development of the seizure disorder? Absolutely. We think it's basically a case of abuse of discretion to some extent. But the special master, our experts... Just to be clear, so there's a causation of the disorder. You just said you're making that claim. Are you also making a claim that the disorder is worse than it otherwise would have been, namely an aggravation claim, because of the initial seizure having been caused by the vaccine? Yes. Okay. And we go to, both our experts decided to doubt them at all, which is a study where they tried to replicate this disease. They had mice that would knock in the mutation that would cause the seizure. They then heated those mice until they seized, which is what happens with kids with fevers, and then they left them for two months. And then they developed seizures using other methods, and they found that the mice who had been subjected... I think it seems like it's evidence that could have been accredited by the special master, and maybe you could have prevailed, but how does that help us? We have to decide that there was not sufficient evidence for the way that the special master went. That's the case. He essentially, it's very interesting, he actually read the Dutton Report, and he analyzed it correctly. That basically what the Dutton Report said was that where kids, or mice, had had a febrile seizure in a very young age, when they had seizures later on, those seizures were much worse than the seizures in mice who seized without having had a febrile seizure before. So that is the entire case. He analyzed it properly, then ignored it. And he said there was no evidence that connected the febrile seizure to the disorder. And that was a complete abuse of discretion. He read the report and didn't comment on it. The only comment was from their expert, who said that the young lady did not get heated. She was not heated. That is what a febrile seizure is. It is a fever. That is the heat. And the replication was when a mouse had a febrile seizure, and then had a seizure later on, those seizures were much more severe. So our argument is her terrible situation right now, where she's having seizures all the time, is directly related to that seizure, and that seizure was caused by the fever, which was caused by the vaccination the morning before. So that's the thrust of our case. The other thing I found indicating some problem with the special answer was he took the idea that the first seizure didn't leave any footprints as a sign that it had nothing to do with anything. And that is basically all literature involving this particular seizure disorder shows that every one of them starts with a seizure, a febrile seizure that does nothing, and then another one that does nothing. So even though medicine cannot see what the damage has done, the damage is there, and the only reason you know it's there is because basically all hell breaks loose later on. So our argument is we think that the special master abused discretion in ignoring the Dutton Report and holding that there was no evidence that the febrile seizure caused the long term. So why don't we hear from the government, and we will save the remainder of your time for rebuttal if you need it. Thank you. Ms. Collison, please proceed. Good morning, and may it please the Court. As Mr. McHugh notes, this case concerns a child with a genetic seizure disorder called Dravet Syndrome, which clinically manifests around six months of age, coinciding with procedure standard childhood vaccines. More than a dozen Dravet cases have been adjudicated in the vaccine court in as many years, including the Ostenbach case ruled on by this court just seven weeks ago. And as this court recently noted in Ostenbach at three, in vaccine cases, special master's fact findings are reviewed under the arbitrary and capricious standard, and reversible error is extremely difficult to demonstrate. If the special master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for the decision. And is it your view that the evidence presented in the expert testimony and all of the other precedent that you've just referred to, those six cases, was similar or the same as presented in this case? Some of it was, but most importantly, as special masters should for all causation impact cases, special master Moran specifically assessed the facts in this case. He looked at the articles presented in this case and analyzed them and weighed all of the evidence and determined that the petitioners have failed to prove that April 2015 vaccinations were a but-for cause of Herger-Day syndrome. Petitioners have not pointed to any material evidence overlooked by the special master. Well, we heard just a few minutes ago about, I think, an assertion of disregard of, was it Dutton? Is that the name? Did I get the name right? The Dutton report about the mice and how later seizures were worse in the subgroup that had an initial feeble seizure than in the other group. The Dutton study was submitted at the very beginning of the case and was responded to by respondents expert Dr. Raymond in his very first report, Exhibit A at 5. The court can find Exhibit A in the appendix at 2496. And the special master did consider it among other animal studies that were submitted in the case. But ultimately, the special master concluded looking at human studies, animal studies, studies specific to what we know about the SCN1A gene itself, that a petitioner had not met their burden in this particular case. Where can we find the special master's discussion of Dutton? Let me see. Thank you, Mr. McHugh. I think I see it on page appendix 56. Yes, that's what Mr. McHugh just pointed out to me. So again, it's just one of several animal studies presented in this case and Dr. Raymond critiqued the study because it was specific to GUESS+, which is on the spectrum of SCN1A disorders, one of the milder disorders. It's also not Dravet syndrome, which is what Amy was diagnosed with in this case by both of her neurologists and Dr. Raymond agreed with their diagnosis based on the medical records and presentation in this particular case. So it's not the same level of disease that was tested. It's also an animal model. Does the point you just made about how the Dutton study did not involve Dravet syndrome, is that to be found in the special master's report? I think you referred to Dr. Raymond making that distinction. I'm not sure that he points out that distinction in this recitation. But that is something that is certainly in the record as explained by Dr. Raymond in Exhibit A and potentially in his future reports as well. Mr. McHugh also contends that the special master found that the first seizure was just a one-off. Do you agree that the special master did that? And if so, isn't that an error? No. As explained in our brief, that term one-off doesn't appear anywhere in the special master's decision. And the special master did appropriately characterize the first febrile seizure in the case and acknowledged that it was a manifestation, an effect of her Dravet syndrome, but did not cause or worsen her Dravet syndrome based on the evidence as a whole. The government agrees with petitioners that the de novo SCN1A variant made her susceptible to febrile seizures around six months of age, but that's true for all children with Dravet syndrome. Because the SCN1A gene helps maintain the balance of excitation and inhibition in the brain, children with Dravet syndrome can have febrile seizures after anything that elevates their temperature, be it a vaccine, a virus, a hot bath. Eventually, as they age, they will develop seizures that don't need a high temperature to induce them. So that's also responsive to the suggestion that Mr. McHugh made that scientists don't understand the reason why a de novo mutation in the SCN1A gene would have a pathogenic effect. They do now. In the record here, we have the genetic reports, both from 2017 and from 2018. We have identification by the neurologist attributing the child's Dravet syndrome to her SCN1A mutation, and we have the assessment by Dr. Raymond in the case over the course of three expert reports that explain why the particular frame shift mutation in this particular case, that's an insertion of five base pair amino acids, it results in a loss of function protein, why that would have a pathogenic effect in the child. Anything further? Unless the court has any specific questions, under the deferential standard of review in this case, the special master's decision should be affirmed. Thank you. The difference in this case before, a lot of cases, we're dealing with experts who are theorizing that this must have happened because of that without a direct connection, without any direct connection. This Dutton study is a direct connection. They were studying seizures. They weren't studying Dravet syndrome. They were studying seizure disorders, period, across the board. And they heated the mice to give them the temperature that the kid would have had. And they found out that that seizure, the first cerebral seizure, also left no traces. But the seizures they instilled later on, when the kids were basically what they deemed adults, two months later, were serious. I mean, they were worse than they saw in seizures instilled by people who did not have this cerebral seizure. So the connection was made, and the connections indicated that the situation was worse because of the first cerebral seizure. And that's what we see in Dravet syndrome across the board. They have the cerebral seizure, which would normally be something that a lot of kids have with no effect at all. But then all hell breaks loose. I understood Ms. Collison to be making the following point. If I understand it correctly, it was that Dr. Raymond said that the Dutton study didn't involve Dravet syndrome, but a different seizure disorder. And that's at least one reason not to draw an inference for the current case. Is that correct as a description of what Dr. Raymond said? Dr. Raymond broke down Dutton-Dravet syndrome into numerous categories based upon what happened. Of course, how he did it, we don't know. But that was his opinion. He thought that this didn't specifically deal with exactly the type of Dravet syndrome that this child had. And I don't know where he gets this. A lot of his statements are not supported by anything except him. And I think that's one of the problems with Dr. Raymond, and why I was a little happy to see him there. But in this case, they were studying seizure disorders across the board. They didn't identify with Dravet syndrome. It was seizure disorders in children after a febrile seizure, because that was a common pattern. But the Dravet syndrome, what happened here, they saw these seizures after the febrile seizure were serious. In other words, they weren't just more seizures. They were bad. And that was why this is a connection, because this is what happens with Dravet syndrome. There is a febrile seizure that almost doesn't get noticed. And then it falls apart. And that's what his child is not. Thank you. We thank both sides. The case is submitted. That concludes our proceedings at this time.